GALLENKAMP STORES CO.; Mercury Distributing Company; Acme Quality Paints; and F. & G. Merchandising, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Retail Clerks Union Local 770, Retail Clerks International Association, AFL–CIO, Intervenor.

K–MART, a division of S. S. Kresge Company, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Retail Clerks Union Local 770, Retail Clerks International Association, AFL–CIO, Intervenor.

HOLLYWOOD HAT CO., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Retail Clerks Union Local 770, Retail Clerks International Association, AFL–CIO, Intervenor.

Nos. 21621, 21632 and 21649.

United States Court of Appeals Ninth Circuit.

Aug. 8, 1968.

Stanley E. Tobin (argued), Hill, Farrer & Burrill, Los Angeles, Cal., for appellant Hollywood Hat Co.

John C. Donnelly (argued), Hill, Farrer & Burrill, Stanley E. Tobin, Los Angeles, Cal., Clark, Klein, Winter, Parson & Prewitt, Detroit, Mich., for appellant K-Mart.

Carl W. Robertson (argued), of Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for appellants Gallenkamp Stores Co. and others.

Kenneth M. Schwartz (argued), of Arnold, Smith & Schwartz, Los Angeles, Cal., for intervenor.

Leonard M. Wagman (argued), Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, Jerrold H. Shapiro, Atty., N.L.R.B., Washington, D. C., Ralph E. Kennedy, Reg. Director, N.L.R.B., Los Angeles, Cal., for National Labor Relations Bd.

Before HAMLEY, ELY and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge.

These cases come before the court on petitions to review and set aside an order of the National Labor Relations Board, (hereafter the Board), issued against the petitioners, and on the Board's cross-petitions for enforcement of the order, pursuant to Section 10(e) and (f) of the National Labor Relations Act as amended, (hereafter the Act), 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 160(e) and (f). The Board's final decision and order are reported at 162 NLRB No. 41.

The Board's order is based in part on findings made in a representation proceeding under Section 9 of the Act, 29

U.S.C. § 159. The proceeding, Board Case No. 21–RC–9309 is part of the record pursuant to Section 9(d) of the Act, 29 U.S.C. § 159(d). The findings which go to the heart of the representation part of the case are not now reported.[1]

Two major problems are involved,— (1) whether the finding and decision that a licensor and his licensees in a retail department store are joint-employers, and the resulting establishment of a store wide unit for labor bargaining, are correct; (2) whether alleged irregularity and union misconduct voided the election.

### The Proceedings Before the NLRB

There are three segments to the case here, (1) the representation hearing, (Case No. 21–RC–9309), (2) the proceedings challenging the election which followed and (3) the unfair labor practice proceedings when the employers refused to bargain with the Union, (Case No. 21 CA–6937). We do not reach the questions arising from the third segment of the case.

The case began with a representation petition filed in 1964 by the Retail Clerks Union Local 770, Retail Clerks International Association, AFL-CIO, (hereafter the Union, and now an intervenor in this appeal), in Case No. 21–RC–9309. The Union sought certification as bargaining representative of a store wide unit at the Commerce, California store of K-Mart, a division of S. S. Kresge Company, (hereafter K-Mart), one of petitioners herein.[2] The proposed store wide unit included employees of licensees of K-Mart, to wit, Gallenkamp Stores, Mercury Distributing Company, Acme Quality Paints, F. & G. Merchandising, Hollywood Hat Co., and

Besco Enterprises Inc., (hereafter the licensees). The licensees, except Besco, are petitioners herein.

There followed a hearing. The Regional Director issued a Decision and Director of Election, finding that the licensees and K-Mart were "joint employers of the employees in each of their respective departments," and that a store wide unit, including all employees at the Commerce store was appropriate. An election was directed.

■ K-Mart and licensees F. & G., Gallenkamp and Mercury requested Board review of the Regional Director's Decision and Direction of Elections. The Board denied the request for a review on the ground that they raised "no substantial issues warranting review." This constituted an affirmance of the Regional Director's unit determination.[3]

The election was conducted by the Regional Director; out of 80 eligible voters, 79 ballots were cast, 37 in favor of and 33 against representation by the Union. 9 ballots were challenged. The Regional Director conducted an administrative investigation of the challenges and objections without a hearing, and issued his Supplemental Decision and Direction. He ruled on the challenges and ordered the remaining ballots be opened and counted. He found all the Union objections and all but K-Mart objection No. 3, to be without merit. He further ordered that if the revised tally showed a majority of valid ballots had been cast for the Union, the election should be set aside on the basis of the objection No. 3 of K-Mart, which he had found meritorious, and a new election conducted at a later date to be specified.

1. This case, before the Board, K-Mart v. Retail Clerks Union, Etc., 162 NLRB No. 41, also appears in 64 LRRM 1045 and '67 Labor Law Reports (CCH) 20998.

2. Originally four representation proceedings were consolidated involving four K-Mart stores. The proceedings before this court concern only K-Mart's store at Commerce, California, (Case No. 21-RC-9309).

3. Section 102.67(f), Series 8 of the Board's Rules, as amended (29 C.F.R.

102.67(f)) provides, in part, that "denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding." Thus, the Board's denial of the requests for review of the Regional Director's decision and direction of election at K-Mart's Commerce store constituted an affirmance of the Regional Director's unit determination.

The employers (K-Mart and the licensees) and the Union, filed timely requests for review of the Regional Director's rulings. The Board granted the Union's request for review insofar as it related to the Regional Director's sustaining of the employer's objection No. 3, and denied the requests for review in all other particulars on the ground that they raised "no substantial issues warranting review." The Board directed the Regional Director to open and count the challenged ballots. The Board also provided that it would review the Regional Director's disposition of K-Mart's objection No. 3 in the event the Union won the election. The Regional Director opened and counted the five remaining ballots and issued a revised tally showing that of 80 eligible voters, 75 cast ballots, of which 38 were for and 37 against the Union.

On September 9, 1965, the Board issued its Decision on Review and Certification of Representative, reversing the Regional Director's disposition of the employer's objection No. 3. The Board certified the Union as the collective bargaining representative for the employees in the store wide unit at K-Mart.

There followed an unfair labor practice proceeding (Case No. 21–CA–6937), when K-Mart and the licensees refused to bargain with the Union, resulting in a Board order to cease and desist from the refusal to bargain. In view of our disposition of other issues in the case, we do not reach the question of the unfair labor practice proceedings.

*The Finding that K-Mart and its Licensees are Joint-Employers and the Finding that a Store Wide Bargaining Unit was Appropriate.*

The Regional Director found, and the Board adopted and approved his finding, that K-Mart and its licensees were joint employers.

K-Mart's Commerce store here involved, includes various departments operated by licensees under uniform lease agreements with K-Mart. Among the licensees were: Gallenkamp, selling shoes; Mercury, selling clothing; Acme, selling paints and household items; F. & G. Merchandising, selling auto accessories and servicing automobiles; Hollywood Hat, selling hats; and Besco, selling jewelry and cameras.

There followed findings as to how the licensees operated as an integral part of the K-Mart store and the *findings on control of labor relations* upon which the Board's decision was based.

Each licensee agreement contained a declaration by the parties that the success of their "enterprise is dependent upon compliance with common standards hereafter referred to as Rules and Regulations for the conduct of the business as established from time to time by (K-Mart)." Paragraph 10 provided:

"The licensor (K-Mart) shall from time to time * * * establish, amend, modify or revise uniform Rules and Regulations consistent with this License Agreement which shall govern but not be limited to the following subjects: order and appearance of the store * * * employment practices, personnel and store policies * * *".

The Rules and Regulations, (hereafter the Rules), thus promulgated by K-Mart provide that K-Mart's manager is "responsible for the over-all operation" of the store, and he may request "immediate action" from the licensee if he believes that the licensee has not provided "sufficient help, or if any employees are inefficient or objectionable." Under the heading "General Operation of Store," a licensee is directed "Not [to] permit the continuance of a labor dispute involving its department which materially affects the sales or threatens the operation of other licensees or licensor."

Although the Rules declare all hiring and terminations to be under the supervision of each licensee's manager, they authorize K-Mart's personnel supervisor to receive applications from persons desiring employment. Such applications are to be made available to the licensees on request. The Rules include provisions for employee discipline, smoking restrictions, rest periods, places where em-

ployees are permitted to keep their personal belongings, employee purchases, employee wearing apparel and identification badges, and the greeting of customers.

Under the Rules, each party to the licensing agreement agrees that it will not "hire an employee or former employee of the other without first checking" with the other. The Rules also require licensees' employees to attend briefing and training sessions "to familiarize themselves with store policies and regulations pertaining to the conduct of the business in their department, as well as the entire operation." In addition, the Rules require each licensee to operate its department during hours fixed by K-Mart. K-Mart controls advertising, merchandising and the physical arrangement of the store. It also retains the right to audit the licensees' sales records; to handle all complaints, exchanges and refunds through its own service desk; and to control credit.

K-Mart's ultimate power is established by Paragraph 10 of the license agreement. Under its provisions, K-Mart alone has authority to issue uniform Rules and Regulations "for the benefit of the common enterprise," and to amend, modify or revise them. Violation of these Rules and Regulations subjects the offending licensee tŏ termination of its license by K-Mart. It is apparent from the present Rules, that K-Mart has already exercised its authority with respect to a number of employment conditions within the area of mandatory collective bargaining.[4]

K-Mart contends the Regional Director and the Board have "repeatedly emphasized that K-Mart appears to the public to be one enterprise operated by one merchant, and this is a basis for the conclusion that K-Mart exercises control over the labor relations policies of its licensees." K-Mart relies on Esgro Anaheim Inc., 150 NLRB 401 (1964), Bab-Rand Co., 147 NLRB 247 (1964), and S.A.G.E. Inc. of Houston, 146 NLRB (1964), and contends that in Thriftown Inc., 161 NLRB No. 42 (1966), a minority view became the rule of the Board and that Thriftown abruptly changed a long established rule relating to licensors and licensees without articulating the reasons for a sudden change, in violation of the rule established by the Supreme Court in NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).[5]

4. Thus, working hours and work days are mandatory subjects of collective bargaining, Local Union No. 189, Amalgamated Meat Cutters & Butchers Workmen of North America, AFL-CIO v. Jewel Tea Co., 381 U.S. 676, 691, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Under the current Rules and Regulations, licensees are required to operate their departments during hours established by K-Mart. It also appears that K-Mart operates the Commerce store on Sundays.

Similarly, employee work loads are a mandatory subject of bargaining, N.L.R.B. v. Bonham Cotton Mills, Inc., 289 F.2d 903, 904 (5 Cir. 1961). Under K-Mart's Rules and Regulations, K-Mart may prescribe the number of employees it deems necessary to operate a licensee's department.

Moreover, hiring practices and tenure of employment may be mandatory subjects of collective bargaining, N.L.R.B. v. Houston Chapter, Associated General Contractors of America, Inc., 349 F.2d 449, 451–452 (5 Cir. 1965), cert. denied 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540; N.L.R.B. v. Tom Joyce Floors, Inc., 353 F.2d 768, 769–771 (9 Cir. 1965). Under the Rules and Regulations, neither K-Mart nor a licensee can hire an employee or former employee of the other without first checking with the latter.

Finally, company rules concerning coffee breaks, lunch periods, smoking, employee discipline, and dress are mandatory bargaining subjects, Winter Garden Citrus Products Cooperative v. N.L.R.B., 238 F.2d 128, 129 (5 Cir. 1956); See Lloyd A. Fry Roofing Co. v. N.L.R.B., 216 F.2d 273, 274 (9 Cir. 1954). K-Mart's Rules and Regulations contain provisions governing these and other similar working conditions for all employees at the Commerce store.

5. National Labor Relations Board v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965), stated, "When the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and

Section 9(b) of the Act, 29 U.S.C. § 159(b) provides that "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

■■ This court has long recognized that "[G]reat latitude is given to the Board in determining 'the unit appropriate for the purposes of collective bargaining' " and that the Board's unit determination will not be disturbed unless it is arbitrary or capricious. Foreman & Clark, Inc. v. National Labor Relations Board, 215 F.2d 396, 405–406 (9 Cir. 1954), cert. denied, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697; National Labor Relations Board v. Merner Lumber and Hardware Company, 345 F.2d 770, 771 (9 Cir. 1965), cert. denied, 382 U.S. 942, 86 S.Ct. 397, 15 L.Ed.2d 352; N.L.R.B. v. Deutsch Co., 265 F.2d 473, 478 (9 Cir. 1959), cert. denied, 361 U.S. 963, 80 S.Ct. 592, 4 L.Ed.2d 544; N.L.R.B. v. Smith, 209 F.2d 905, 907 (9 Cir. 1954); N.L.R.B. v. E-Z Davies Chevrolet and Carl Simpson Buick, Inc., 395 F.2d 191 (9 Cir. 1968). In Accord: May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145 (1945); Packard Motor Co. v. N.L.R.B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); S. D. Warren Co. v. N.L.R.B., 353 F.2d 494, 497–498 (1 Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300; N.L.R.B. v. Checker Cab Company, 367 F.2d 692, 697–698 (6 Cir. 1966), cert. denied, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546.

In N.L.R.B. v. Deutsch Co., supra, this court upheld the Board's certification of the Union as a representative for all the company's employees in a single unit.

The company had two different plants and it contended that each plant should constitute a separate bargaining unit. In N.L.R.B. v. Checker Cab Company, supra, the court upheld a finding by the Board that the appropriate bargaining unit constituted all the regular and part time drivers of Checker cabs in Detroit, thereby including 286 independent employers of taxi drivers. The Checker Cab Company and its member-owners had opposed the bargaining unit as inappropriate because it required the independent employers to join in collective bargaining, when there had been no previous history of such bargaining.

■ The Board has consistently found that where the licensor has control over the labor relations of a licensee, a joint employer situation exists. In Franklin Simon & Co., 94 NLRB 576 (1951), Frostco Super Save Stores Inc., 138 NLRB 125 (1962), Spartan Dept. Stores, 140 NLRB 608 (1963) and Grand Central Liquors, 155 NLRB No. 33 (1965), the control existed expressly in the licensing agreements.

In *Esgro Anaheim Inc.*, supra, *Bab-Rand Co.*, supra, and *S.A.G.E.*, supra, relied on by the employers, the inquiry in each case was whether the licensor retained control over the labor relations policy of the licensee. A factual holding determined the licensor did not. In S.A.G.E. the Board expressly distinguished *Spartan*, supra, *Frostco*, supra, and Bargain City, 131 NLRB 803 because in those cases "the licensor exercised substantial control over the labor relations policy of the licensees * * * In contrast, S.A.G.E. does not have control over the personnel and labor policies of its licensees that were present in the cited cases." (p. 328).

In Thriftown Inc., 161 NLRB No. 42 (1966), (63 LRRM 1298), there was dis-

'give clear indication that it has exercised the discretion with which Congress has empowered it' [6] (citing cases).

"[6]. Of course, the Board may articulate the basis of its order by reference to other decisions or its general policies laid down in its rules and its annual reports, reflecting its 'cumulative experience' * * * so long as the basis of the Board's action, in whatever manner the Board chooses to formulate it, meets the criteria for judicial review * * *". (380 U.S. at 443, 85 S.Ct. at 1064).

cussion of the appearance of the market to the public, but the decision states it is *not* based on "mere 'appearances' " of the market. The decision also states "We do not intimate by this holding that licensor-licensee arrangements in a discount department store necessarily creates a joint-employer relationship." (63 LRRM at 1300). *Thriftown* is easily justified on the findings therein, that the licensor exercises "significant control over the operators personnel policies," (63 LRRM at 1289), "control over day by day operation" by virtue of Rules and Regulations, (63 LRRM at 1300), and the finding " * * * that Thriftown is in a position to influence the labor relations policies of licensee Astra. Since the power to control is present by virtue of the operating agreement, whether or not exercised, we find it unnecessary to consider the actual practice of the parties * * * ". (63 LRRM at 1300).

Counsel for K-Mart in their brief and argument rely heavily on the dissent by Chairman McCulloch and Member Fanning in Thriftown Inc., 161 NLRB No. 42 (1966). They printed the dissent as an appendix to their brief.

Counsel claim that Thriftown was a departure from Board precedent and the establishment of a new rule; that it was followed by Jewel Tea Co., 162 NLRB No. 44 (1066); K-Mart (Jackson) 161 NLRB No. 92 (1966); and the Board's decision in the case at bar, K-Mart (Commerce) 162 NLRB No. 41.

We note *K-Mart* No. 92, supra, and *Jewel Tea* No. 44, supra, were decided by the full board without dissent. But even more illuminating, the Board decision in K-Mart (Commerce) No. 41 our case, was before *McCulloch, Fanning* and Zagoria. The first two members were the authors of the dissent in *Thriftown*.

We are not called upon to enforce or deny enforcement to an order in *Thriftown*. The fact that the dissenters in *Thriftown* decided our case should be enough to demonstrate the lack of merit in K-Mart's contentions.

The holding of the Board, in the case at bar, is within the main stream of Board decisions finding joint-employers when there is control by a licensor over the licensee's labor relations. In view of the Board holdings and policy enumerated in the Board cases cited, K-Mart's and the licensees' reliance on NLRB v. Metropolitan Life Ins. Co., supra, is misplaced.

The licensees by separate brief support K-Mart's position, heretofore discussed and urge further (1) that the store wide unit will have a highly disruptive effect upon the store's operation, will prejudice the licensees and not produce sound and stable collective bargaining relationships, and (2) that employees of licensee F. & G. Merchandising Company represent a homogeneous, identifiable and distinct group who lack a sufficient community of interest with other employees, and so should not be included in the store wide unit.

As to the first contention, no authority is cited, and it is without any support in the record. Compare NLRB v. Mead Foods, Inc., 353 F.2d 87 (5 Cir. 1965), in which the Fifth Circuit rejected speculation as to "asserted practical difficulties which may arise from having to bargain with two locals rather than one;" see also, Pacific Coast Ass'n of Pulp and Paper Mfrs. v. N.L.R.B., 304 F.2d 760, 765–766 (9 Cir. 1962). K-Mart and the licensees have worked out their diverse business problems to meet the needs of their joint enterprise, as is shown in their uniform license agreements. Like efforts should be as effective in their bargaining with the Union.

There may be problems with a store wide unit but the problems will not be new. Store wide units have been approved many times. In addition the employees in F. & G. Distributing Company are entitled to representation if they desire. No Union seeks to represent them separately. The contention cannot prevail over the finding that the state wide unit is appropriate.

As to the second contention, it is true that F. & G. employees might constitute an appropriate unit. But here there was the finding of joint employers of the licensees, including F. & G. There was no past bargaining history, nor did any Union seek to separately represent the F. & G. employees.

The determination by the Board that the store wide unit was appropriate conforms to a long standing policy of the Board in cases involving department stores, e. g., Stern's Paramus, 150 N.L.R.B. 799, 803; J. W. Mays, Inc., 147 N.L.R.B. 968, 972; Polk Bros. Inc., 128 N.L.R.B. 330, 331; May Department Stores Company, Kaufman Division, 97 N.L.R.B. 1007, 1008. The store wide unit thus becomes the equivalent of a plant unit within the meaning of Section 9 of the Act, 29 U.S.C. § 159. Plant units have been extensively approved by the Board.

The policy of the Board as to store wide units in department stores is responsive to the statutory command in Section 9(b) of the Act, 29 U.S.C. § 159(b), that the Board make its appropriate unit determinations "in order to assure to employees the fullest freedom in exercising the rights guaranteed [by the Act]."

A separate unit might have been appropriate. The Board found on substantial evidence that a store wide unit was appropriate. The finding was not arbitrary or capricious.

Montgomery Ward and Company, 150 N.L.R.B. 598 (1964) and other like cases cited are not controlling. In these cases the Board held the separate unit of employees of automotive service departments were appropriate. But in each case a labor organization sought to represent the employees in such a unit. The fact that a separate unit might be appropriate does not mean a larger unit would not.

### The Election Issue; Union's Alleged Misconduct.

K-Mart alleged (1) that during months of March and April 1965, Union agents had coerced and intimidated K-Mart employees by threatening loss of jobs if they did not join or support the Union; (2) that during those same months in 1965, Union agents threatened K-Mart employees with physical and other reprisals and engaged in constant surveillance of their activities, thereby creating an atmosphere of fear, prejudicially affecting the election; (3) that Union representatives engaged in a planned scheme of misrepresentation, including distributing a leaflet to K-Mart employees containing deliberately false and misleading statements of wage comparisons between K-Mart and unionized stores;[6] (4) false

6. In objection No. 3, the employers contended that just prior to the election, the Union distributed a leaflet to employees which contained "deliberately false and misleading comparisons of wages and benefits allegedly received by employees of other employers under a 'union' contract for like work" which "were sufficiently material to influence the employees in their determination as to how to vote * * * *".

The Regional Director's investigation revealed that on either April 5th or April 6th, 1965, prior to the election on April 7, 1965, the Union distributed to employees a leaflet which gave a comparison of wage rates in various job classifications between stores under union contract and K-Mart's Commerce store. The leaflet contained the following:

| Job | "Wages Paid K-Mart | Union | Difference to you hourly | wkly. | yrly. |
|---|---|---|---|---|---|
| Checker | $1.80 | $2.35 | plus .55 | $22.00 | $1144.00 |
| Houseware | $1.80 | $2.20 | plus .40 | $16.00 | 832.00 |
| Stock Room | $1.80 | $2.10 | plus .30 | $12.00 | 624.00 |
| Payroll Clk. | $1.80 | $2.30 | plus .50 | $20.00 | 1040.00" |

representations were made concerning payment of Union dues; (5) that on election day, false and misleading statements of fact and law were made to one or more K-Mart employees; (6) and that the Union engaged in wrongful and deliberate inducements for votes by waiving Union initiation fees contingent on the outcome of the election. After the election there arose the question as to whether one Pentecost was an employee on the payroll of a licensee and entitled to vote. The Board sustained the Union's contention that he was not entitled to vote and his vote was not counted.

Since we hold that K-Mart's objection No. 3 was well taken, and that a new election must be held, we do not reach the merits of the remaining objections. Nor do we reach the question as to the right of the employee Pentecost to vote.

We turn to objection No. 3. In support of the objection, K-Mart introduced documentary evidence and affidavits of employees. The Board's Regional Director sustained K-Mart's objection No. 3 but overruled the remaining five objections.[7] Subsequently, the Board overruled the Regional Director with regard to the objection No. 3. In overruling the Regional Director's determination, the Board conceded that the circular was in fact misleading and false, but that some ten days

prior to its dissemination of the false leaflet, the Union had distributed a truthful one on the same subject, and that K-Mart employees could have verified the accuracy of statements contained therein by inquiring of employees at nearby unionized stores.

As a general rule, the Board does not undertake to police or censor the utterance of a party to a representation election in the absence of fraud or coercion. See 3 A.L.R.3d 889. However, the Board and the courts do not condone conduct which creates an atmosphere rendering improbable a free choice of a collective bargaining agent by the employees, and on the objection of any party, it will invalidate an election conducted under such circumstances. The ultimate question that crops up before the Board in each case is whether the pre-election propaganda has lowered the standards of campaigning to the point where it may be said that the uninhibited desires of the employees cannot be determined from the election. N.L.R.B. v. Houston Chronicle Publishing Co., 300 F.2d 273 (5 Cir. 1962); N.L.R.B. v. Trancoa Chemical Corp., 303 F.2d 456 (1 Cir. 1962); 3 A.L.R.3d 894.

"In accordance with the 'wide discretion' entrusted to it, the Board has adopted the policy to set aside a represen-

The Regional Director also found that the Union had previously mailed a letter to unit employees on March 26, 1965, with an attachment listing union wage rates for employees with "1 year of service," in the same classifications as were listed in the above leaflet. The Employers contended that the leaflet quoted was false and misleading because some K-Mart employees enjoyed an hourly wage scale higher than $1.80, and further because the union wages shown were received by employees only after one year's employment, a fact which the leaflet failed to disclose.

The Regional Director found that the K-Mart rates set forth in the leaflet were average wage rates, that the Union had no special knowledge of the actual rates at K-Mart, and that the employees had independent knowledge with which to evaluate the Union's assertions in this regard. Upon these facts, he concluded

that the figure representing K-Mart wages in the leaflet was not a material misrepresentation and thus, did not impair the validity of the election. However, the Regional Director, noting that K-Mart's Commerce store employed a substantial number of employees with less than one year's employment, sustained the objection on the ground that the leaflet failed to disclose that the union rates depicted were the highest of four wage progression rates within each job classification and were received by employees only after one year's employment.

7. We do not reach the question as to the validity of the administrative proceeding conducted by the Regional Director whereby he assumed the facts set forth in affidavits and without an evidentiary hearing, ruled on the objections to the election. Nor do we infer that this was improper.

tation election where it appears that (1) there has been a material misrepresentation of fact, (2) this misrepresentation comes from a party who had special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election. (citing cases) * * * Where these elements are present, the Board has found that the legitimate limits of campaign propaganda have been exceeded and has set aside the election on the ground that it does not reflect the free desires of the employees without further requiring that prejudice to the fairness of the election be shown. * * * " Celanese Corporation of America v. NLRB, 291 F.2d 224 at 226 (7 Cir. 1961); cert. denied 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189. Accord; N.L.R.B. v. Trancoa Chemical Corp., supra; N.L.R.B. v. Bata Shoe Company, 377 F.2d 821 (4th Cir. 1967).

■ The question, therefore, is whether the Union made a material misrepresentation of fact concerning wage rates which could materially affect the results of the election. No Ninth Circuit cases have been called to our attention which precisely consider this problem. Nor have we found any. Reliance must be had on cases from other circuits.

There can be no question that wages are of paramount importance to employees as "they are the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives to bargain." N.L.R.B. v. Houston Chronicle Publishing Company, supra, 300 F.2d p. 280; Graphic Arts Finishing Co., Inc. v. N.L. R.B., 380 F.2d 893, 896 (4th Cir. 1967). Therefore, any misrepresentation concerning wages cannot be considered trivial. The leaflet distributed by the Union on the eve of election contained false and misleading information concerning wages. Union wages were represented to be from thirty to fifty-five cents per hour higher than the wages of the K-Mart store. This means a difference of nearly $600 per year at the minimum union

scale. Such material misrepresentations could reasonably be expected to have a significant impact on the election and prevent employees from registering their free and untrammeled choice as to a bargaining representative.

In Celanese Corp. of America v. N.L.R. B., 121 N.L.R.B. 303 (1958), the union had made a false statement that certain fringe benefits had been won through collective bargaining, when actually they had been established unilaterally by the employer. The Board found that the statement amounted to a "half truth" and did not warrant setting the election aside. The Seventh Circuit in Celanese Corp. of America v. N.L.R.B., 279 F.2d 204 (1960), disagreed, stating that the distribution of a letter by the union less than 24 hours before the election claiming that all fringe benefits were the result of collective bargaining, when in fact some of the benefits had not been so obtained, rendered the election invalid. The Supreme Court, in N.L.R.B. v. Celanese Corp. of America, 365 U.S. 297, 81 S.Ct. 689, 5 L.Ed.2d 688 (1961) remanded the case with an order to reconsider it in light of N.L.R.B. v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L. Ed.2d 455 (1961), where the court held that a minor and unconfusing mistake in the employer's name did not warrant setting the election aside. On remand the Court of Appeals adhered to its view that the election was invalidated by the union's false statement. Celanese Corp. of America v. N.L.R.B., supra, 291 F.2d 224.

In Graphic Arts Finishing Co., Inc. v. N.L.R.B., supra, the Fourth Circuit held that issuance by the union 24 hours prior to an election of a circular which misrepresented the hourly wage and fringe benefits being paid in the area under union contracts constituted a material misrepresentation which rendered the election unfair where there was no opportunity by the employer to reply.

In N.L.R.B. v. Houston Chronicle Publishing Company, supra, the Fifth Circuit refused to force the employer to bargain collectively with the union which had won

the representation election because of a letter delivered to employees on the day before the election. The letter contained purportedly authoritative and truthful assertions concerning wages and pensions but the assertions were speculative, exaggerated, half-truths and not completely accurate. "An election can serve its true purpose only if the surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative." 300 F.2d 280.

Collins & Aikman Corp. v. N.L.R.B., 383 F.2d 722 (4 Cir. 1967) was a case like ours as to misrepresentation on the eve of the election and where the margin of union victory in the election was by one vote. The court followed N.L.R.B. v. Houston Chronicle Publishing Co., supra, and Celanese Corporation of America v. N.L.R.B., supra, and invalidated the election.

Schneider Mills, Inc. v. N.L.R.B., 390 F.2d 375 (In banc, 4 Cir. 1968) involved false statements on the eve of election by leaflet and broadcast and grossly intemperate statements several days before. The court invalidated the election and refused enforcement of the Board's order.

The cases above cited, and our holding here is not contrary to Hollywood Ceramics Co., Inc., 140 NLRB 221, 224 (1962), where the Board said:

"We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election."

In our case, the circulars were distributed on the eve of election. The misrepresentations made by the union concerned a most vital issue—wages. There was no opportunity by the employers to reply to the circular. The union won the election by only one vote, 38 to 37.

In each case where the problem of false representation or misconduct by a Union is shown, the court on review can be guided by the principles set forth in the cases above but the court must necessarily decide each case on an ad hoc basis. It must take into account the impact of the false statement or misconduct, the source of knowledge of the person making the statement, the time of the happening in relation to the election, the knowledge had and sources of knowledge readily available to the voters, the opportunity for reply and the reply if any, the closeness of the vote at the election, and finally make the decision as to whether the election should be sustained on review, applying the standard that "the findings of the Board with respect to question of fact if supported by substantial evidence on the record considered as a whole shall * * * be conclusive." Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

We hold that the determinations by the Board of the status of K-Mart and its licensees as joint-employers and of the store wide unit as an appropriate bargaining unit, were correct. We hold that the election was invalid.

Remanded to the Board for further proceedings in accordance with this opinion.

ELY, Circuit Judge (dissenting in part):

I respectfully dissent from the majority opinion insofar as it holds that there must be a new election. The holding rests upon the majority's disagreement with the Board's application of the principle that a *substantial* campaign misrepresentation fatally corrupts the election process. Numerous definitions of "substantial" have been attempted, but the majority recognizes that false campaign propaganda is not substantial unless it had an impact of such significance that the election "does not reflect the free desires of the employees * * *." In the circumstances of this case, I believe that our court should respect the expert determination made by the Board.

Surely, it cannot be doubted that the Board has a paramount interest in the preservation of the integrity of elections conducted under its own processes, and the Board has not hesitated to set aside elections significantly contaminated by false campaign representations. See, e. g., Grede Foundries, Inc., 153 N.L.R.B. 984 (1965); Coca Cola Bottling Co. of Louisville, 150 N.L.R.B. 397, 399–400 (1964); Steel Equip. Co., 140 N.L.R.B. 1158 (1963); Hollywood Ceramics Co., 140 N.L.R.B. 221 (1962); United States Gypsum Co., 130 N.L.R.B. 901 (1961); Cleveland Trencher Co., 130 N.L.R.B. 600, 602–03 (1961).

As I see it, the Board's decision is entirely supportable. My Brothers emphasize that "[t]he union won the election by only one vote, 38 to 37." This indicates to me that the "free desires" of at least thirty-seven of the electors were not inhibited by the mistaken literature, and if thirty-seven of the seventy-five closely knit voting employees were not deceived, it is difficult for me to believe that the other thirty-eight were so misled that their votes did not reflect their "free desires." I have no doubt that the Board was influenced by this consideration, as well as by the fact that the union, only ten or eleven days before the distribution of the supposedly misleading pamphlet, had mailed a leaflet in which the employees were correctly advised. It is unrealistic, I think, to require precise accuracy in campaign literature issued by both employers and unions in elections frequently characterized by vigorous militancy. It should be recognized, as the Seventh Circuit has observed, that "[p]rattle rather than precision is the dominating characteristic of election publicity * * *." Olson Rug Co. v. NLRB, 260 F.2d 255, 257 (7th Cir. 1958). Since this is so, recognition of the common sense of the workers here involved should lead us to uphold the Board's decision that "free desires" were not restricted.

I certainly cannot disagree with the majority's observation that "wages are of paramount importance to employees," but all of the circumstances which are present here, including the history of the long dispute and the nature of the working environment, do, in my opinion, provide a solid, logical foundation for the Board's rejection of the contention that the electors were deceived about a fact in which their interest was "paramount."

The history of the present dispute emphasizes a principal reason why the courts should not, as the majority has here done, give so little weight to a decision made by an expert body upon conflicting facts and inferences. The representation petition was filed in December 1964, and the election was conducted on April 7, 1965—over three years ago. The contesting parties, as well as the Government, have doubtless incurred much expense. Now the antagonisms must be revived, and the policy behind the National Labor Relations Act, that of the speedy resolution of labor disputes, is unnecessarily subverted.

As long as our court substitutes its judgment for that of the Board in cases such as this, we may expect to be confronted with an increasing number of the kind of problems with which our court should not be burdened.

I would enforce the order of the Board.